The GOOD FUND, LTD.—1972, a Texas limited partnership, and Good Financial Corporation, a Texas corporation, Plaintiffs,

v.

Marcus F. CHURCH and Marcus F. Church, Trustee; the Dow Chemical Company, a Delaware corporation; Rockwell International Corporation, a Delaware corporation; and the United States of America, Defendants.

Perry S. McKAY, Charles C. McKay and the First National Bank of Denver, Personal Representative of the Estate of Marcus F. Church, Deceased, Successor to Marcus F. Church; Perry Sidway McKay, Successor to Marcus F. Church, Trustee, Plaintiffs,

v.

William C. ACKARD; Samuel Butler, Jr.; and Butler Investments, Ltd., a limited partnership, Intervenors,

v.

UNITED STATES of America; Dow Chemical Company; and Rockwell International Corporation, Defendants.

GREAT WESTERN VENTURE, a Colorado Limited Partnership, Plaintiff,

v.

UNITED STATES of America; Dow Chemical Company and Rockwell International Corporation, Defendants.

Civ. A. Nos. 75–M–1111, 75–M–1162 and 75–M–1296.

United States District Court, D. Colorado.

May 27, 1982.

Douglas Tisdale, Brownstein, Hyatt, Farber & Madden, Denver, Colo., for The Good Fund, Ltd. and Good Financial Corp.

Howard K. Holme, Charles J. Beise, Peter F. Breitenstein, Fairfield & Woods, Denver, Colo., for Marcus F. Church and Marcus F. Church, Trustee, Perry S. McKay, Charles S. McKay and The First National Bank, and William C. Ackard, Samuel Butler and Butler Investments, Ltd.

William F. Schoeberlein, Sherman & Howard, Denver, Colo., for Rockwell Intern. Corp.

Jake J. Chavez, Sp. Asst. U. S. Atty., Sherman & Howard, Denver, Colo., for The United States of America.

James E. Elliott, Jr., Larry R. Martinez, Elliott, Martinez & Allman, Denver, Colo., for Dow Chemical Co.

Robert G. Pierce, Butler, Landrum, Pierce & Turner, Lakewood, Colo., Robert Montgomery, Montgomery, Little, Young, Campbell & McGrew, P. C., Denver, Colo., for Great Western Venture.

Malcolm M. Murray, Asst. Atty. Gen., Denver, Colo., for State of Colo.

H. Lawrence Hoyt, Asst. County Atty., Golden, Colo., for Jefferson County, Colo.

## MEMORANDUM OPINION AND ORDER FOR SUMMARY JUDGMENT AND FOR RULE 54(b) DETERMINATION

MATSCH, District Judge.

The extraordinary nature of the issues involved in this litigation has caused unique problems of case management. From the beginning it has been apparent that the traditional procedural model for pleading, discovery and trial would not be functional. Accordingly, for more than six years, I have directed the parties to proceed in particular phases, with differing emphases on the facts and the law. The objective has been to define and delimit the claims for relief in a manner which would permit a focus on the challenges to jurisdiction without exhausting the litigative resources of the parties and the court.

Of particular importance to an understanding of the process by which I have come to the conclusion that most of the claims in these consolidated cases must be dismissed for lack of jurisdiction is a recognition that the operative facts have been evolving while these cases have been in this court. Indeed, it may well be that ulti-

mately the plaintiffs' present dilemma will be resolved through the actions of other branches and levels of government and that their freedom to act without judicial intervention will facilitate that result.

## I. THE PARTIES AND PLEADINGS

On October 22, 1975, plaintiffs, The Good Fund, Ltd.—1972, a Texas limited partnership whose purpose was to invest in underdeveloped land, (on March 25, 1977, Good Fund Investment Co., a Texas corporation, became successor in interest to the Good Fund, Ltd.—1972), and Good Financial Corporation, a Texas corporation, incorporated in 1969, which served as a general partner of Good Fund, Ltd., ("Good Fund"), filed the lawsuit designated 75–M–1111, based upon diversity jurisdiction, against Marcus F. Church, Marcus F. Church, Trustee, ("Church"), and the Dow Chemical Company. The subject matter of their complaint concerned the 1973 purchase by Good Fund from Church of certain real estate located in Jefferson County, Colorado, near the Rocky Flats Nuclear Plant. Plaintiffs alleged that because the land had been substantially contaminated from plutonium, americium and uranium, it was unfit for intended residential or commercial development. Based upon common law property theories, plaintiffs sought rescission, actual, and punitive damages from Church. Asserting claims of common law torts of ultrahazardous activity, negligence, nuisance and trespass, and inverse condemnation under the Colorado Constitution, plaintiffs sought actual and punitive damages from Dow.

On October 30, 1975, plaintiffs, Marcus F. Church, and Marcus F. Church, Trustee, (in 1979, Marcus Church died and January 4, 1980, Perry S. McKay, Charles C. McKay, and the First National Bank, personal representatives for the estate of Marcus F. Church, were substituted as the party by the court), filed the lawsuit designated 75–M–1162 against the United States of America, the Dow Chemical Company, and North American Rockwell Corporation (designated Rockwell International in the Amended Complaint), ("government defendants"), with jurisdiction under 28 U.S.C. §§ 1331, 1332, and under the Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671 et seq. Church alleged that from 1953 to the present, he and his family have owned 1,440 acres and certain water rights in Jefferson County, Colorado, adjacent to the Rocky Flats Plant. Operations at the plant include processing radioactive materials, primarily plutonium. There have been admitted escapes of unknown amounts of such material with an uncertain degree of deposition on the subject land. The plaintiffs contend that the presence of radioactive material on the land presents a health hazard and makes the property unusable.

On November 12, 1975, the Church defendants filed a motion in 75–M–1111 for summary judgment on claims one through three (mutual mistake, failure to disclose, and express misrepresentation), and to dismiss claims four through seven (express warranty of marketable title, and joinder of Church to prosecute tort actions against the United States). A hearing was held on this motion July 1, 1976, and the matters were taken under advisement. A ruling on those motions was deferred because of the dependence of those claims upon the factual issues involved in 75–M–1162.

On December 4, 1975, plaintiff Great Western Venture, ("Great Western"), a Colorado limited partnership, filed the lawsuit designated 75–M–1296, against the United States of America, Dow Chemical Company, and Rockwell International Corporation, based upon jurisdiction under 28 U.S.C. §§ 1331, 1332, and under the Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671, et seq. Great Western alleged that on or about November 9, 1970, it purchased 243 acres in Jefferson County, Colorado, adjacent to the Rocky Flats Plant, which property has been contaminated by radioactive substances, destroying its value, for which all defendants are liable on common law theories of negligence and strict liability. It is also alleged that Dow and Rockwell are liable on theories of trespass and nuisance, and for exemplary damages.

On December 30, 1975, answers were filed by the government defendants in all three cases.

On April 16, 1976, counsel for Good Fund filed an amended complaint in 75–M–1111, adding Rockwell and the United States as defendants on claims for common law torts of strict liability for ultrahazardous activity, negligence, nuisance and trespass. Additionally, claims were alleged against Rockwell for taking and inverse condemnation under the state constitution based on diversity jurisdiction, and punitive damages are sought against Rockwell.

After a hearing on June 7, 1976, all three actions were found to have common questions of law and fact, and they were consolidated by an order entered June 8, 1976.

Initially, it was the view of this court that the complexity of this litigation could be reduced by placing the primary focus on the factual questions of what was on the subject land, in what amounts and with what effects on the use of that land.

Accordingly, at a pretrial conference on November 16, 1976, the parties discussed a proposal that the government carry out a soil sampling and testing program to assess what radioactive materials were present upon plaintiffs' lands and to provide reasonably reliable scientific data on the amounts and significance of such deposits. The government took the initiative to design and conduct procedures to provide that data. The traditional burden of proof upon the plaintiff was altered because, as agreed by the parties and the court, the necessary testing was beyond the means of a private party, both economically and with respect to access to the necessary scientific technology, including qualified laboratories. There was disagreement about the sampling and testing protocol. To resolve those disputes and to lay a foundation for admitting the data summaries as evidence in the ultimate trial, some 20 days of evidentiary hearings were held, including a tour of the Rocky Flats Plant. Those hearings were on Saturdays between January 8, 1977, and September 13, 1977, and a mass of documentary exhibits was received. The concerns in those hearings involved the manner in which samples were to be collected, the preparation of the samples for analysis, the methods of analysis and the elements to be analyzed. On November 4, 1977, the parties entered into a stipulation concerning quality controls in the defendants' soil testing program. The sampling and testing program proceeded during 1978 and 1979. The raw data was submitted in Exhibit A to the government's First Pre-Trial Statement, filed January 17, 1979. After additional testing in July, 1979, the Church plaintiffs filed a statement of their position on admissibility. They agreed to accept the raw data from sampling methods B, C & D, but not A, and not the government's analysis of the data. On October 23, 1979, the parties entered into a stipulation with respect to the lodging of the evidence produced during the soil sampling program.

On July 25, 1977, Church filed a motion to amend the complaint in 75–M–1162 and to file a crossclaim against the federal defendants in 75–M–1111. On February 15, 1978, a motion to intervene as plaintiffs in 75–M–1162 was filed by William C. Ackard, Samuel Butler, Jr., and Butler Investments, Ltd., a limited partnership, ("Ackard-Butler"). On March 13, 1978, following a hearing held March 9, 1978, the court granted this motion to intervene with specific conditions to diminish prejudice to defendants.

The intervenors alleged that in 1955 they acquired certain property which they sold in 1973 to the Good Fund. This property is part of the real property which is the subject matter of 75–M–1111. In 1977, Ackard-Butler reacquired the same property from Good Fund Investment Co. in lieu of foreclosure of a deed of trust which Good Fund had executed to secure payment of the purchase price. The complaint in intervention alleges that this property has been contaminated by radioactive and toxic materials, and claims are made against the United States under the Federal Tort Claims Act on theories of negligence and strict liability and against Dow and Rockwell, under diversity jurisdiction, for negligence, strict liability, trespass, nuisance, and for exemplary damages.

The conditions upon which the court granted the motion to intervene were that: 1) the intervenors were bound by the discovery which had already been conducted and could not recall or cross-examine witnesses or deponents whose testimony had already been taken; 2) the intervenors were not permitted to assert any claims not asserted in their complaint tendered with their motion to intervene; 3) the intervenors were not allowed to recover for any claims which would be barred by applicable statutes of limitations but for intervention; and 4) the intervenors were bound by the soil testing program and related stipulations to the same extent as the other parties.

On March 13, 1978, the court also granted Church's motion to amend the complaint in 75–M–1162 and to file a crossclaim in 75–M–1111. Claims were added with respect to damages to the Church-Good lands. These lands had been owned by the Church family from 1955 to May 21, 1973, when they were conveyed to the Good Fund. They were reacquired by Church through foreclosure of the deed of trust in 1976. Additionally, adjustments were made to the amount of damages from negligence to reflect differences due to the 1974 purchase by the government of a buffer zone, and to the amount of exemplary damages due from Dow and Rockwell.

The crossclaim in 75–M–1111 incorporated by reference the amended complaint in 75–M–1162, and alleged that if the Church defendants were held liable to the Good Fund, the government was liable to the Church defendants in the same amount. In addition, Church requested damages incurred due to their participation in this lawsuit, including attorneys' fees, related court costs, and damages to Church's reputation, all of which are said to result from the government's action or inaction. Both the complaint in 75–M–1162 and the crossclaim in 75–M–1111 were again amended in June and August, 1981.

During the March, 1978, hearing, the court also considered the government defendants' motion for a protective order, filed February 10, 1978. The court granted this motion in its entirety and in the March 13, 1978, order stopped all formal discovery. That discovery stay was later clarified, at an April 6, 1978, scheduling conference, to authorize the taking of depositions for the preservation of testimony. In addition, the court indicated that the voluntary exchange of information and documents between the parties was not precluded by the moratorium on formal discovery. The court again revised the discovery stay at a February 23, 1979, scheduling conference to require that the parties file a notice of any intended depositions. Any disputes concerning the deposition could then be resolved prior to the deposition.

On April 6, 1978, another scheduling conference was convened. At it, the court decided to proceed with the consolidated lawsuits insofar as they are against the government defendants. The other issues between the private parties were subordinated and deferred until resolution of the issues involving the responsibility of the government defendants.

## II. THE FACTUAL ALLEGATIONS

To move forward in the development of the issues on the claims against the government defendants, the parties were directed to file initial pretrial notebooks, setting out the substance of the factual presentations to be made at trial. Accordingly, pretrial statements were filed by counsel for Church and Ackard-Butler on July 11, 1978; by counsel for Good Fund on August 17, 1978; and by counsel for the government defendants on January 17, 1979.

Fairfield and Woods, counsel for Church and Ackard-Butler, submitted in three volumes, containing some 497 pages, a copyrighted pretrial statement and in a fourth volume an exhibit list. In accordance with the court's indication that the initial pretrial statements should emphasize facts, the legal theories which would provide relief upon proof of the facts were not detailed. Negligence was described and other legal theories were generally identified as: "1) the corporate defendants are strictly liable

for damages resulting from their ultrahazardous operations at Rocky Flats; 2) they are liable in nuisance; 3) the doctrine of res ipsa loquitur is applicable; and 4) both corporate defendants and the United States are liable for trespass without proof of negligence." [Pre-trial Statement, Vol. I, at 2.]

The facts asserted in the Church and Ackard-Butler pretrial statement may be summarized as follows: In the manufacture of nuclear weapons, the Rocky Flats plant handles large quantities of hazardous materials, including the radioactive materials plutonium, americium, uranium, thorium, tritium, curium, neptunium and polonium, and non-radioactive materials beryllium, lithium, cadmium, etc. The site which was chosen for the plant by Dow, the United States, and the Austin Company, in 1951, is not suitable for a nuclear plant. Its disadvantages include its proximity to Denver, a large metropolitan area, and geographical features peculiar to it such as strong prevailing winds blowing toward Denver from the west. The plant generates substantial quantities of radioactive and nonradioactive waste materials, the handling and disposal of which has permitted contamination of the adjacent property. Waste oil, laden with radioactive material, was stored in drums, which, in time, corroded, leaking the contents into the soil. Some of that soil was resuspended into the air and some of the contamination was redistributed through the water table. Additional waste contamination has resulted from waste burning and sanitary landfill activities.

At least two major fires have occurred at the Rocky Flats Plant. At 10:10 p. m., September 11, 1957, a fire was discovered in a plexiglass glove box in which plutonium was stored in Building 771. Apparently, the plutonium spontaneously ignited. The heat burned through the plexiglass wall and into the filtering system. The fire in the filtering system was not extinguished until 11:28 a. m. the next day. A second major fire occurred in the afternoon of Sunday, May 11, 1969, in Building 776/777 in a glovebox containing plutonium. There have been other fires over the years.

Two factual areas important to the Church and Ackard-Butler position which were not included in the pretrial statement concern the health effects claimed to be resulting from Rocky Flats radiation and the public fear of the plant impacting the market value of the parties' lands. In June, 1981, counsel for these parties supplemented the record by submitting Exhibit 4 to their amended complaint of June 16, 1981. This exhibit, entitled "Epidemiologic Evaluation of Cancer Incidence in the Denver SMSA and its Relation to the Rocky Flats Plant", copyrighted by Fairfield & Woods, supplements those parties' factual statements with regard to the health hazards claimed to be resulting from the plant. This analysis suggests a significant correlation between cancer incidence in the Denver area and exposure to radioactivity from the Rocky Flats Plant.

The Good Fund attached to its pretrial statement an analysis of its complaint as amended. The 8th through 21st claims which are asserted against the government defendants are summarized as: (8, 13 & 17) the tort of ultrahazardous activity; (9, 14 & 18) negligence; (10, 15 & 19) nuisance; and (11, 16 & 20) trespass against all three defendants. Claims 12 and 21 are identified as taking and inverse condemnation contrary to the Colorado Constitution, Art. 2, § 15, against Dow and Rockwell. In the pretrial statement, Good Fund preliminarily asserted that all claims against the defendant United States were appropriate under 28 U.S.C. § 2674: negligence under *U. S. v. Union Trust*, 221 F.2d 62 (D.C.Cir.1955), *aff'd per curium* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 799 (1955); trespass under *U. S. v. Gaidys*, 194 F.2d 762 (10th Cir. 1952); and both strict liability for ultrahazardous activities and nuisance under the philosophy of *Rayonier v. U. S.*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), which extends the liability under the Federal Tort Claims Act to novel and unprecedented forms although some conflict exists in this area, *Dalehite v. U. S.*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

A general statement of the proposed proof of a prima facie case is that in the midst of unimproved ranch land, the government constructed a plant. Several years later, development of the land surrounding the plant is anticipated; however, state and county authorities preclude this development because the land is contaminated. If it is contaminated, the contamination must have come from the plant. It is urged that the doctrine of res ipsa loquitur would be particularly applicable since it is more equitable and practical to place the burden on the government defendants who, through unknown and unknowable activities, have produced effects outside the plant.

The Good Fund pretrial statement presents facts concerning the acquisition of the property from Church and the Ackard-Butlers in 1973 and development efforts. On July 10, 1973, Good Fund presented a rezoning application to the Jefferson County Planning Department requesting a zoning change from A–2 (agriculture) to R–1A (residential). Following an extensive series of hearings involving state and county health experts, on May 12, 1975, the Jefferson County Board of County Commissioners finally denied this rezoning request by adopting Resolution No. CC75–94. It stated that because of substantial concerns expressed by public agencies, officials, and citizens, with respect to whether plutonium concentrations exist on the property in quantities sufficient to constitute a real danger to human health, residential development of the property in the requested density would be premature until assurances "can be obtained from public health and environmental protection agencies that such a use would not constitute a real danger to the health and safety of future residents." Subsequently, the property was retransferred by Good Fund to Church through foreclosure and voluntarily to the Ackard-Butlers.

Good Fund asserts that, during the soil samplings hearings and discovery in this case, evidence has been adduced that the purchased lands were contaminated by radioactive materials. The Rocky Flats Plant operations involve manufacturing and machining nuclear weapons parts using hazardous, radioactive substances including plutonium, americium, uranium, thorium, curium, tritium, and beryllium. Incidents which have occurred at the plant, including the oil barrel storage, the 1957 and 1969 fires, and other incidents are likely sources of the measured contamination. The government's conduct is said to have generated pervasive public fear which has greatly depressed the value of the land.

The pretrial statement submitted by the government defendants summarizes their factual defense that no appreciable health hazard exists on plaintiffs' lands because of operations at the Rocky Flats Plant. Soil testing has shown that the quantities of plutonium and americium on plaintiffs' lands south and west of the plant are virtually at the background levels resulting from worldwide atmospheric results of the testing of nuclear weapons by many nations. Levels east of the plant are slightly higher, but are below the levels in the guidelines proposed by the Environmental Protection Agency.

Attached Exhibit A presents the data resulting from defendants' soil sampling and testing program. Soil was sampled at 89 locations on plaintiffs' lands using 4 methods (A, B, C, & D): A, in accordance with the Jefferson County Health Department's method of sweeping surface dust from a $2 \times 2$ meter area at each site; B, in accordance with the Colorado Health Department's method of compositing 15 samples of $5 \times 6$ cm by .32 cm deep at each site; C, in accordance with the Rockwell method of compositing five samples of $10 \times 10$ cm by 5 cm deep at each site; and D, by compositing five "core" samples 8.9 cm diameter by 15 cm deep, taken beneath each C-type sample. The "background" level of radiation which has resulted from atmospheric testing of nuclear weapons was determined from similar sampling at other locations.

Attached Exhibit B to the government's pretrial statement is the Environmental

Protection Agency's "Proposed Guidance on Dose Limits for Persons Exposed to Transuranium Elements in the General Environment", published November 30, 1977, 42 Fed.Reg. 60956. It awaits final promulgation under the signature of the President.

The text of the Proposed Guidance states that in order to assure the protection of persons in the general population by limiting the radiation doses that an individual in a critical segment of the population may receive from concentrations of transuranium elements present above average background levels in the general environment, the following recommendations shall apply for the guidance of Federal Agencies:

1. The annual alpha radiation dose rate to members of the critical segment of the exposed population as the result of exposure to transuranium elements in the general environment should not exceed either:

a. 1 millirad per year to the pulmonary lung, or

b. 3 millirad per year to the bone.

Appended to the Proposed Guidance in Annex V are the methods by which the Proposed Guidance may be implemented. Soil screening is one method. Inherent in its application is the assumption that soil contamination by transuranium elements will cause radiation exposure through human pathways such as inhalation of resuspended soil, ingestion of food grown on the land, and ingestion of drinking water contaminated by soil runoff. The soil screening levels are based upon mathematical models which project the relationship between the measured level of soil contamination and human exposure. The screening level is the total transuranium element soil concentration level in the top 1 cm of soil. Levels of contamination below soil screening levels are considered unlikely to lead to dose rates in excess of those recommended by the Proposed Guidance. The dose rates themselves are based upon further projections which evaluate the probability that the exposed population will develop such health effects as cancer and genetic defects. Thus, lands with contamination levels less

than soil screening levels of 200 mCi/km$^2$ (millicuries per square kilometer) are considered suitable for normal human activities including residential and agricultural usage.

Exhibit C to the defendants' pretrial statement is the text of the standard for protection against exposure to radiation promulgated by the State of Colorado, Colorado Department of Health, Standards for Protection Against Radiation, 6 C.C.R. 1007–1, pp. 1–9, 160 (1978). This standard establishes a soil contamination level for plutonium at 2.0 d/m/g (disintegrations per minute of plutonium per dry gram of soil or square centimeter of surface area) or 0.01 microcuries per square meter. When this level is exceeded, the land is considered to present a hazard to the public health sufficient to require the utilization of special construction techniques.

Exhibit E is the Rocky Flats Facility/Technical Assessment Document, September, 1977. This assessment was conducted by the EPA at the request of various Colorado officials during the promulgation of the Proposed Guidance specifically to address the question of whether there are significant health effects as a result of operations at the Rocky Flats Plant. Based upon data obtained from federal agencies and the State of Colorado, *the EPA concluded that the dose limitations in the Proposed Guidance had not been exceeded on any offsite lands.*

Exhibit D is defendants' analysis of the health risks associated with the measured contamination on plaintiffs' lands. Defendants assert that the EPA has concluded that the soil screening levels have not been exceeded. The soil sampling data derived in this case confirms this conclusion. Although none of the sampling methods was taken at the depth of one centimeter employed by the EPA in promulgating the Proposed Guidance, Method C gathered samples to a depth of 5 centimeters. When expressed in units of radiation per unit area, 5 cm depth samples have higher values than 1 cm depth samples taken at the same location. None of the samples showed that screening levels had been exceeded.

Thus, the government defendants contend that the contamination of plaintiffs' lands does not present a significant health risk and without an appreciable health risk, the plaintiffs are unable to show that their lands are damaged or that the government defendants have any legal liability.

The government defendants did not address any legal theories of liability other than negligence in their pretrial statement because they had filed on September 15, 1978, a motion for partial summary judgment to dismiss all claims not sounding in negligence. In defense to the negligence claims, defendants assert that they are not liable for damages to the market value of plaintiffs' lands based upon public fear where no showing of actual damages can be made because the law does not recognize the existence of a tort based on a duty to prevent fear in third parties. It is further asserted that the plaintiffs have overestimated the value of their lands; that the location of the Rocky Flats plant was selected at high levels of government for which no liability can result due to the discretionary function exception to the Federal Tort Claims Act; that the design of the plant, its operation and activities, including those specifically addressed in plaintiffs' pretrial statements, have complied with applicable governmental standards of care.

## III. THE LEGAL ARGUMENTS

Following receipt of the preliminary pretrial statements, the approach to this litigation took a new course. Through this time, the efforts of the parties and the court had been directed toward developing the facts. With the pretrial statements the basic factual grounds of the parties' positions were disclosed. The next phase of the litigation was concerned with narrowing the legal theories upon which plaintiffs could seek relief.

The government defendants had moved for partial summary judgment to dismiss all claims against the United States, Dow and Rockwell not sounding in negligence. Defendants' position originates with the contention that there are several areas of immunity which preclude subjecting the United States Government to liability based upon strict liability, nuisance or trespass. The Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, waives sovereign immunity with respect to tort claims only "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Exclusive jurisdiction is vested in the federal district courts for civil actions for money damages for personal and property injury "caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

The statute details exceptions. The United States shall not be liable for punitive damages. 28 U.S.C. § 2674. Liability cannot be based upon an act or omission of a Government employee, exercising due care, in the execution of a statute or regulation. 28 U.S.C. § 2680(a). Also excluded are claims based upon "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

The discretionary function exception was applied in *Dalehite v. U. S.,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). There, plaintiffs claimed negligence on the part of various federal offices and employees involved in a post war program of producing an ammonium nitrate fertilizer for exportation to aid foreign agriculture. The fertilizer was produced and distributed at the instance of the United States according to the specifications and control of the United States. On April 15, 1947, almost 3,000 tons of this fertilizer were loaded on two French ships at Texas City, Texas. One of these ships was additionally carrying a substantial cargo of explosives, the other 2,000 tons of sulphur. A fire broke out in the fertilizer on one of the ships. Both ships exploded,

destroying much of the city and killing many people.

No individual acts of negligence could be shown. The negligence charged was that the United States shipped the fertilizer to congested areas without sufficient investigation or warning. Specific negligence was attributed to drafting and adopting the fertilizer export plan, the manufacturing process, and failure to oversee the loading. The Supreme Court interpreted the "discretionary function or duty" to include not only the initiation of programs and activities, but also determinations made by executives or administrators in establishing plans, specifications or schedules of operations, and the acts of subordinates in carrying out government operations in accordance with official directions. The Supreme Court held that each of the acts of negligence in the planning and manufacture of the fertilizer which the District Court had found, was included within the discretionary function exception to the government's waiver of sovereign immunity for tort claims.

An additional exception in the Federal Tort Claims Act is provided for "any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). The Tenth Circuit Court of Appeals interprets the "misrepresentation" exception "to include false representation of any type," including negligent supervision-inspection by an independent government contractor. *Hall v. U. S.*, 274 F.2d 69 (10th Cir. 1959); *Reynolds v. U. S.*, 643 F.2d 707, 712 (10th Cir. 1981), cert. denied, 454 U.S. 817, 102 S.Ct. 94, 70 L.Ed.2d 85 (1981).

In addition to these statutory exceptions, the Supreme Court has implied an exception to liability under the Federal Tort Claims Act for any claims not based upon "negligent or wrongful act or omission." *Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972). In *Dalehite*, the Court interpreted the Federal Tort Claims Act to require some form of misfeasance or nonfeasance and therefore to preclude liability without fault. Absolute liability without regard to the defendant's conduct, imposed whenever damages are sustained as a result of a decision to engage in a dangerous activity, is inapplicable to the United States government.

Plaintiffs in *Laird v. Nelms, supra,* brought their action under the FTCA to recover for property damage allegedly resulting from a sonic boom caused by a military plane flying over North Carolina on a training mission. The Court not only rejected allegations of liability based upon strict liability, under *Dalehite*, but also the alternative theory of liability based upon trespass. The Court construed the asserted trespass theory to be based upon the contention that one who engages in ultrahazardous activity must pay his way regardless of the precautions he may have taken.

In this litigation, the government contends that by clothing their claims in the language of trespass and nuisance, the plaintiffs have simply sought to circumvent the preclusion of liability without fault. In opposition, plaintiffs argue that there is an area of non-intentional, non-negligent, "wrongful" action, for which the government has been held liable under the FTCA. They cite *Hatahley v. U. S.*, 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956) and *U. S. v. Gaidys*, 194 F.2d 762 (10th Cir. 1952). In *Hatahley*, federal agents improperly invoked a Utah abandoned horse statute to justify the destruction of Indian owned horses grazing on public lands. That was considered to be a "wrongful" trespass. *Dalehite* suggested and *Hatahley* held that the government could be held liable for such wrongful although not negligent torts.

In *Gaidys*, a United States Air Force plane crashed shortly after takeoff from Lowry Air Force Base. Burning parts and fuel fell upon the Gaidys' property causing property and personal injuries. Plaintiffs had been unable to prove negligence, but recovery was permitted for a trespass under the FTCA.

The plaintiffs also argue that while the government cannot be held strictly liable for engaging in an ultrahazardous activity,

liability can be found on an ultrahazardous activity theory where there is a showing of fault.

■ Liability under the Federal Tort Claims Act extends to acts of employees and agencies of the United States. The term "federal agency" is defined to exclude contractors with the United States. 28 U.S.C. § 2671. Private corporations performing government contracts, although they have a contractual right to indemnity from the government, may be held liable for negligent operations unless Congress has unambiguously provided immunity. *Brady v. Roosevelt Steamship Co.*, 317 U.S. 575, 63 S.Ct. 425, 87 L.Ed. 471 (1943). However, governmental immunity may be conferred if a contractor is executing the constitutionally authorized will of Congress. *Yearsley v. W. A. Rose Construction Co.*, 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940). The government urges that extending immunity to the contractors is appropriate in this case because all claims not based upon negligence are really asserted against the federal government. They are based upon activities at Rocky Flats of manufacturing nuclear weapon components from plutonium which are engaged in exclusively at Rocky Flats and cannot be engaged in by anyone other than the federal government.

The Atomic Energy Act of 1954 authorizes the Atomic Energy Commission (AEC) to "engage in the production of atomic weapons, or atomic weapon parts, except that such activities shall be carried on only to the extent that the express consent and direction of the President of the United States has been obtained, which consent and direction shall be obtained at least once each year." 42 U.S.C. § 2121(a)(2). Since this authority was originally given to the AEC by the Atomic Energy Act of 1946, it has been vested in a federal agency which has gone through several reorganizations.

The 1946 Atomic Energy Act was superseded by the 1954 Act. The Energy Reorganization Act of 1974, 42 U.S.C. § 5814, abolished the AEC and vested its responsibility for the operation of government nuclear research and production facilities, which includes authority with respect to nuclear weapons, in the Energy Research and Development Administration (ERDA). The licensing and related regulatory functions of the AEC were transferred to the Nuclear Regulatory Commission (NRC). Effective October, 1977, ERDA's authority with respect to nuclear weapons production was transferred to the Department of Energy, established by the Department of Energy Organization Act, 42 U.S.C. §§ 7131 and 7151.

Except for the authority of the AEC, and its successor organizations, it is "unlawful... for any person to transfer or receive in interstate or foreign commerce, manufacture, produce, transfer, acquire, possess, import, or export any atomic weapon." 42 U.S.C. § 2122. The AEC chose to exercise its authority by contracting with private enterprises by what has become known as the "management contract concept" instead of performing its undertakings directly through its own facilities and staff. *Carson v. Roane-Anderson Co.*, 342 U.S. 232, 72 S.Ct. 257, 96 L.Ed. 257 (1952).

In 1951, the United States acquired 2,500 acres of land in Jefferson County, Colorado, for a nuclear weapon component production facility known as the Rocky Flats Plant. In 1974 and 1975, a buffer zone was acquired which increased the size of the facility to an area of 6,500 acres. Ownership of the plant and all its facilities is vested in the United States.

In 1952, the AEC entered into a management contract with Dow Chemical Company. Dow managed Rocky Flats under contract from July 1, 1952, through June 30, 1975. From July 1, 1975, to the present time, Rocky Flats has been managed by Rockwell International Corporation. Examples of these contracts were attached as exhibits to the Affidavit of Herman Roser submitted in support of the government's motion. The government is authorized by these contracts to appear on the behalf of the contractor in defense of a claim against the contractor arising from contract performance. Another provision provides for Nuclear Hazards Indemnity in accordance

with the Price Anderson Act, 42 U.S.C. § 2210.

▆ In the manufacture of nuclear weapons parts, the Rocky Flats Plant handles large quantities of radioactive materials, including the radioisotopes: uranium 238 (U238), uranium 235 (U235), plutonium 239 (Pu239) and americium 241 (Am241). These are source, by-product, or special nuclear materials as defined in the Atomic Energy Act, 42 U.S.C. § 2014(e), (z), and (aa). The authority to regulate source, by-product and special nuclear materials was reserved exclusively by Congress to the federal government in the Atomic Energy Act. *Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976). The federal government reserved for itself an absolute monopoly on the nuclear industry in the 1946 Act. The 1954 Act abolished the government monopoly over nuclear technology and allowed private operation of nuclear reactors under AEC supervision. The government was the sole owner of special nuclear material until 1964 when private ownership subject to licensing was authorized for limited purposes. Private ownership and licensing of special nuclear material has never been permitted for nuclear weapons production. 42 U.S.C. § 2073(e)(6).

Rocky Flats is a facility in the nuclear weapons production complex of the United States under the supervision of the Albuquerque Operations Office. The Rocky Flats plant can be characterized as an ultrahazardous enterprise, because of the presence of the special nuclear material plutonium 239. Pu239 is a manmade radioactive element. As with other radioactive isotopes, plutonium 239 has an unstable nucleus which decays spontaneously emitting radiation.

The physical characteristics of plutonium make working with it very difficult and dangerous. It reacts rapidly with oxygen. Some operations must be carried out in an inert atmosphere, others in a dry air atmosphere. Plutonium operations are conducted in glove boxes, both to control the atmosphere and to shield the workers from radiation. The air pressures in the glove boxes are lower than those in the surrounding rooms so that there should be no air leakage from the box into the room. The atmosphere within the glove boxes flows through a filtering system.

Plaintiffs vehemently oppose extending the government's immunity to the contractors. Relying upon standards developed in the context of property taxation immunity, *U. S. v. Boyd,* 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964), they argue that congressional intent is essential to conferral of immunity upon the contractors. The relevant legislation is devoid of an expression of congressional intent to confer immunity upon Dow and Rockwell. Furthermore, plaintiffs argue that even if afforded the government's immunity, the contractors would only be immune from strict liability without fault and the facts have been insufficiently developed to determine whether the contractors' activities fall within this category.

These cases present unique questions. The Rocky Flats Plant is a singular facility within the peculiarly governmental function of providing for the national defense. Only the government has the authority to possess and use special nuclear materials in the context of a weapons system. The core question in this litigation is whether private citizens can use the authority of the judicial branch of that government to define a duty of care to be followed by the executive and legislative branches. In seeking an answer to that question, I ordered the plaintiffs to file a brief defining the duty which they seek to establish.

On December 28, 1979, Fairfield and Woods, counsel for Church and Ackard-Butler, filed an 88 page brief with attached exhibits on the government's duty. On March 3, 1980, these same plaintiffs incorporated and supplemented their duty brief in two motions for summary judgment. The first requests summary judgment on claims of strict liability against Dow and Rockwell. The second requests summary judgment against all three government defendants on claims of trespass.

Plaintiffs' analysis of the government's duty is based exclusively upon state law concepts. Their brief deals only with tort law and it fails to address the uniqueness of the enterprise at Rocky Flats.

An underlying question of whether the AEA pre-empted all state tort law in the area of damages related to nuclear energy was resolved in this Circuit on December 11, 1981. *Silkwood v. Kerr-McGee Corporation*, 667 F.2d 908 (10th Cir., 1981). The Price Anderson Act, 42 U.S.C. § 2210, addressed the problem of potential nuclear disasters which might deter industrial development of nuclear energy. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). It requires licensees to purchase private insurance, creates a government indemnity fund, and establishes limits to liability for "extraordinary nuclear occurrences," 42 U.S.C. § 2210(n). In *Silkwood*, the Tenth Circuit held, "[f]or nuclear incidents below the level of an extraordinary nuclear occurrence,... the rules of tort law of the state in which the injury occurred still apply." 667 F.2d at 921. That case involved off site property damage in a stipulated amount caused by escape of plutonium from a nuclear fuel reprocessing plant in Oklahoma. *Silkwood* also held that exemplary damages, awarded by the district court as a punitive measure on the basis that Kerr-McGee had operated the plant negligently and indifferently, were preempted by the extensive federal legislation and regulation in the nuclear industry. 667 F.2d at 923.

■ The FTCA exposes the United States to liability for damages to the same extent as a private person under the law of the place where the tortious conduct occurred. In this case, the applicable law is that of Colorado as limited by the FTCA exceptions for (1) strict liability without fault; (2) discretionary functions; and (3) torts listed in 28 U.S.C. § 2680(h). If state law will impose upon private persons novel and unprecedented forms of liability, they are not excluded from the FTCA, *Rayonier, Inc. v. U. S.*, 352 U.S. 315, 319, 77 S.Ct. 374, 376, 1 L.Ed.2d 354 (1957); nor are activities that are "uniquely governmental" in the municipal law sense that no private person could engage in them. *Indian Towing Co. v. U. S.*, 350 U.S. 61, 64–68, 76 S.Ct. 122, 124–126, 100 L.Ed. 48 (1955).

Plaintiffs assert that the soil sampling and testing program established the fact that plaintiffs' lands are contaminated above background levels with plutonium. This contamination has resulted despite the policy of total containment and operations at Rocky Flats designed to effectuate that policy. Accordingly, they say that a duty should be imposed upon the government commensurate with the risks from such contamination in light of the knowledge that absolute safety is not possible. This duty could be characterized in terms of trespass, nuisance, negligence, or strict liability.

With respect to trespass, plaintiffs adhere to their position that the FTCA waives sovereign immunity for nonintentional, nonnegligent, wrongful trespass. They assert that a trespass has been established since plutonium above background levels has been found on plaintiffs' lands; that neither negligence nor intention is required; and actual damage to the land need not be proven.

■ Civil liability for trespass developed to deter intrusion upon a possessor's interest in the exclusive possession of land, since a breach of peace was likely to result. The intrusion itself is the trespass. The requisite degree of fault and damage varies. In Colorado, one may be subjected to liability for intentionally intruding upon another's land, regardless of damage. *Miller v. Carnation Co.*, 33 Colo.App. 62, 516 P.2d 661, 664 (1973). It is unclear whether liability without proof of damage would extend to an unintended trespass.

The Supreme Court of Oregon has published a thoughtful analysis of what renders an intrusion upon another's land actionable as a trespass. There is a point at which the entry is so trifling that the law will not recognize it. As the magnitude of the intrusion diminishes, the magnitude of the harm, i.e. damages, and the defendant's conduct, i.e. degree of intent or fault, are

considered in evaluating whether the intrusion constitutes an actionable trespass. *Martin v. Reynolds Metals Co.*, 221 Or. 86, 342 P.2d 790 (1959), *cert. denied*, 362 U.S. 918, 80 S.Ct. 672, 4 L.Ed.2d 739 (1960).

■ The entry in this case is of an amount of radioactive material which produced no apparent physical changes in the land. Plaintiffs admit that the issue of whether there are any risks associated with this level of radioactive deposition is still a matter of speculation in the scientific community. The evidentiary hearings show that opinions on this subject tend to be influenced by political philosophy. It is my conclusion that the plaintiffs can show nothing more than a potential harm from the deposition levels on their property and that is not a sufficient invasion of their property interest to be actionable.

■ As distinguished from trespass, the concept of nuisance protects a landowner from an unreasonable interference with the right to use and enjoy the property. *Miller v. Carnation Co., supra*, 516 P.2d at 664. It may be based upon intentional invasion, negligent invasion, or one so dangerous and out of place in its surroundings as to fall within the principle of strict liability. *Baughman v. Cosler*, 169 Colo. 534, 459 P.2d 294, 299 (1969). A remedy based upon nuisance requires a balancing of incompatible uses and an evaluation of the respective suitability of the uses to the locality. If the harm caused to another's use of land is serious, a use which is unsuitable to the locality is generally unreasonable as a matter of law regardless of its social utility.

In Colorado, as elsewhere, negligence is the failure to observe reasonable standards of care required by the circumstances. The degree of care necessary is commensurate with the foreseeable risks. Plaintiffs assume that the risks associated with handling special nuclear material at Rocky Flats are great and therefore that the standard of care should be high.

■ The duty of care relevant to Rocky Flats is imposed upon the contractors who operate the plant, and upon the government

as owner of the plant, its materials and products, as employer of the contractors, and by applicable federal statutes and regulations.

In addition to being bound by Colorado law to observe reasonable care in the circumstances, a standard of care is imposed upon Dow and Rockwell by their contracts with the United States. For example, in the Dow contract, attached as Exhibit A to the Roser Affidavit, an article is included relating to "Safety, Health and Fire Protection." It provides, "[t]his article is included in this contract with a clear understanding that such operations involve materials and processes which require that the Contractor exercise the utmost skill to assure safe operating conditions for employees as well as the public. The contractor shall take all reasonable precautions in the performance of the work under this contract to protect the health and safety of employees and of members of the public and to minimize danger from all hazards to life and property." Dow Contract, Art. XVII at 44–45. Similar provisions are included in the Rockwell Contract, Exhibit B to the Roser Affidavit. With respect to nuclear safety, the Rockwell Contract provides that "the contractor recognizes that such operation involves the risk of a nuclear incident which, while the chances are remote, could adversely affect the public health and safety. In the operation of the nuclear reactor, the Contractor will exercise a degree of care commensurate with the risk involved." Rockwell Contract, Art. XL at 107.

Rockwell is also bound by its contract to comply with administrative safety and environmental standards. Although such standards are relevant to establish the applicable standard of care, proof of compliance is not necessarily proof of due care. *Summit County Development Corporation v. Bagnoli*, 166 Colo. 27, 441 P.2d 658 (1968).

■ With respect to the United States, plaintiffs assert that an affirmative duty is imposed upon it as a landowner to correct unnatural conditions foreseeably resulting in injury to adjoining property. The government has contended that as an em-

ployer of independent contractors, the general rule is that it is not vicariously liable for the negligent acts of Dow and Rockwell. Plaintiffs contend that the United States has a nondelegable duty to see to it that the contractors perform their contracted work consistently with a high standard of care. The basis of this nondelegable duty is Colorado law providing that when work is "inherently dangerous" a landowner may be held liable for the negligence of his independent contractors. *Western Stock Center, Inc. v. Sevit, Inc.*, 195 Colo. 372, 578 P.2d 1045 (1978).

 "Inherently dangerous" work is distinguished from "ultrahazardous activities," such as blasting with dynamite, for which a landowner may be held strictly liable regardless of the implementation of independent contractors. *Garden of the Gods Village v. Hellman*, 133 Colo. 286, 294 P.2d 597 (1956). "Inherently dangerous activities" are not within a strict liability concept. An activity is inherently dangerous if it presents foreseeable and significant risks of harm. The employer is not held liable unless the independent contractor performs the work which causes damage negligently. *Western Stock Center, supra*, 578 P.2d at 1050.

Liability has been imposed in Colorado without fault for damages relating from the "ultrahazardous activities," dynamite blasting and impoundment of water. *Id.* Defendants do not concede that Rocky Flats is an ultrahazardous activity. In *Silkwood*, the Tenth Circuit held that Oklahoma courts would apply strict liability to the escape of plutonium, "a highly toxic and dangerous activity. Nuclear energy is surely an area in which no court will, at last, refuse to recognize and apply the principle of strict liability." 667 F.2d at 921 (citations omitted). As applied by the Tenth Circuit, the concept of strict liability for an ultrahazardous activity applies to an activity which has foreseeable abnormal risks. It imposes absolute liability on one engaging in that activity for all resulting damages which are within the scope of the foreseeable risks.

Although the United States is immune from strict liability without fault, plaintiffs urge application of strict liability to Dow and Rockwell and move for summary judgment subject to proof of damages.

The plaintiffs have filed a separate brief on the question of whether fear of future harm can be a basis for compensation from any activity, given the transitory nature of fear, and given its susceptibility to manipulation through the mechanisms by which communications are submitted to the public.

A brief on fear was filed by counsel for Church and Ackard-Butler on April 25, 1979. By a letter of May 30, 1979, Good Fund's counsel informed the court that they were generally in accord with that brief. The government replied with a brief and a motion to dismiss all claims based on fear of third parties. On January 14, 1980, Fairfield and Woods filed a second brief on fear.

Plaintiffs assert that evidence of reasonable fear which depresses the market value of property particularly affected is admissible to establish damages. They say that to determine market value after a taking, fear is relevant if there is a basis in reason or experience for the fear, the fear enters into the calculations of persons who deal in the buying and selling of similar property, and the market value depreciates because of the existence of such fear. *Texas Electric Service Co. v. Nelon*, 546 S.W.2d 864, 868 (Tex. Civ.App.1977). In addition, plaintiffs encourage the court to consider tort liability based on the creation of fear which depreciates property values. Fear alone is suggested as a separate basis for recovery if the failure to prove present injury precludes compensation on any of the other theories urged.

 It is clear that the kind of fear which may be presented by the evidence in this case is a public reaction which is conjectural, transitory and ephemeral. This litigation itself has generated some of the publicity which may be considered to have caused fear in third parties. Moreover, such fear is induced by actions and statements of numerous public and private per-

sons, over whom the U. S. government has no control. It is conceptually difficult to impose a duty upon the government when the agencies creating the fear are not within their control. To the extent the fear is of the very presence of Rocky Flats, it is incident to a governmental activity for which the government is immune from liability. In addition, public comment and publicity generating this fear is an exercise of legitimate first amendment discourse concerning a controversial government project.

Plaintiffs have not provided authority for a tort based on creation of fear without physical damage. The cases cited by plaintiffs concerning the effect of fear on market values are in the context of condemnation proceedings. The Colorado cases, *G. B. & L. R. R. Co. v. Eagles*, 9 Colo. 544, 13 P. 696 (1887), and *G. B. & L. R. R. Co. v. Doyle*, 9 Colo. 549, 13 P. 699 (1887), involve physical bombardment of plaintiff's premises by rocks and debris from blasting operations.

If this case progressed to a point where a tort of creation of fear in third parties was considered, it would be because plaintiffs had failed to establish the other bases of liability due to the lack of evidence of physical harm to the property. Allegations of physical harm are based upon future health hazards. If the future health hazards have not been shown, third party fear may be unreasonable. Unreasonable fear should not provide a basis for recovery.

The possibility of future health hazards may not be actionable at all. The Tenth Circuit "has recognized that a complaint based upon the possibility of contracting cancer in the future as a result of past exposure to a carcinogenic substance does not state a common law cause of action. *Bussey v. Safeway Stores, Inc.*, (10th Cir. Sept. 19, 1978)." *Silkwood*, 667 F.2d at 919.

An additional recurrent issue has been the extent to which the due process and just compensation clauses of the Fifth Amendment are implicated by the claims in this case. Plaintiffs have taken the position that their lands have been rendered unin-habitable and therefore irreparably damaged. As a ground for dismissal of all claims based on fear, and in defense to summary judgment on strict liability, defendants contend that this position thrusts plaintiffs' claims into an area of inverse condemnation. This court lacks jurisdiction over such claims in amounts greater than $10,000.00. 28 U.S.C. § 1346(a).

The Church plaintiffs were parties to the original condemnation proceedings. Diminution in the value of the remaining portion of the land may have been recovered during the condemnation proceedings. This issue was discussed at the April 6, 1978, scheduling conference and I ordered that the files from the condemnation proceedings be retrieved.

At that scheduling conference, I also said that if plaintiffs were asserting a claim of inverse condemnation under the fifth amendment, it would be dismissed for lack of jurisdiction. To clarify their position, plaintiffs Church and Ackard-Butler have submitted arguments with respect to fifth amendment issues in their duty brief and in their May 28, 1980, supplementary brief concerning their fifth amendment taking claim. None of the plaintiffs originally asserted fifth amendment claims. Good Fund did assert an inverse condemnation claim against Dow and Rockwell based upon the Colorado Constitution. In the June 16, 1981, amended complaint in 75–M–1162, fifth amendment claims were added by Church and Ackard-Butler.

Counsel for Church and Ackard-Butler contend that a cause of action may be implied directly from the fifth amendment for deprivation of property without due process. This argument is based on *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), as extended to the fifth amendment in *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). In *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), the Supreme Court held that a remedy against individuals was available directly under the Constitution, although the allegations would also support a claim under the

FTCA. However, not all tortious conduct by government agents rises to constitutional torts. *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

Church and intervenors also assert a constitutional taking claim directly under the fifth amendment. The Tucker Act, 28 U.S.C. §§ 1346(a) and 1491, grants jurisdiction for such claims in excess of $10,000.00 exclusively to the Court of Claims. To avoid this, plaintiffs encourage the court to exercise "pendent jurisdiction" over this claim. Pendent jurisdiction has been exercised over federal statutory claims which fail to meet the minimum $10,000.00 jurisdictional amount previously required in 28 U.S.C. § 1331. *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

■ Plaintiffs' pendent jurisdiction argument is not persuasive. The Tucker Act does not simply provide jurisdiction, it waives sovereign immunity. Unlike the $10,000.00 jurisdictional requirement of 28 U.S.C. § 1331, the $10,000.00 maximum in 28 U.S.C. § 1346 is related to the Tucker Act's waiver of sovereign immunity. This waiver must be considered within the act's jurisdictional limitations.

With either claim asserted directly from the fifth amendment, sovereign immunity is an issue. In their duty brief, plaintiffs assert that the fifth amendment is its own waiver of sovereign immunity. They also assert that there is no discretionary function immunity under the fifth amendment. In *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), the Supreme Court considered whether Congress may, consistent with the Constitution, impose a limitation on liability for nuclear accidents resulting from operation of private nuclear power plants licensed by the federal government. Plaintiffs contended both that the Price-Anderson Act's limitation of tort liability is arbitrary government action adversely affecting their property rights contrary to the due process clause, and that in the event of a nuclear accident, according to the mechanisms of the Act, their property would be taken without assurance of just compensation. The Court found each of these claims justiciable.

The Court concluded that the first claim could be implied directly from the fifth amendment. Plaintiffs had challenged not the fact that a statutory limit on liability had been imposed, but that the particular figure was arbitrary. The Court stated that "candor requires acknowledgment that whatever ceiling figure is selected will, of necessity, be arbitrary in the sense that any choice of a figure based on imponderables like those at issue here can always be characterized." *Id.* at 86, 98 S.Ct. at 2637. This arbitrariness was not considered to be constitutionally flawed because Congress had rationally predicated the ceiling upon consideration of the remoteness of the possibility of an incident and the correlative likelihood that if an incident did occur, Congress would enact extraordinary relief.

An additional due process contention was that the liability provided by the act was arbitrary because not a *quid pro quo* for the common law rights it abrogated. The Court did not consider whether the act was required to substitute for the common law rights it replaced, since it was considered to be a reasonable substitute.

The Tucker Act did not bar the second claim in *Duke Power* because plaintiffs were not seeking compensation for a taking, but a declaratory judgment that the act was unconstitutional by failing to provide assurance of compensation in the event of a taking. Had the Tucker Act been applicable, the declaratory relief sought would be unavailable since the Tucker Act provides for monetary, but not equitable relief.

An additional motion for summary judgment was filed by the government defendants December 7, 1979. This motion is based upon the doctrine of primary jurisdiction. It is contended that the EPA is the federal agency with the exclusive authority under the AEA to establish generally applicable standards for protection of the environment from transuranium elements such as plutonium and americium. In 1977, the EPA promulgated the Proposed Guidance.

It also published an assessment of Rocky Flats which concluded that the Proposed Guidance dose limits had not been exceeded and therefore judged the lands adjacent to Rocky Flats suitable for all normal use. Under the doctrine of primary jurisdiction, the court is requested to defer as a matter of comity to the statutory authority and expertise in factual determinations of the EPA and hold that plaintiffs' lands are unharmed. In conjunction with this motion, defendants submitted notice of request to take judicial notice of published EPA documents, the Proceedings of Public Hearings, Response to Comments, and Selected Topics: Transuranium Elements in the General Environment. The issues presented in this motion were argued at the May 15, 1980, hearing.

Primary jurisdiction is a doctrine developed by the courts to defer to an agency when the functions of the agency and the court may overlap. It is applied "where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body: in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *U. S. v. Western Pacific R. R.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). Both uniformity of the regulatory scheme and the agency's specialized knowledge, experience, and flexibility are factors counseling application of the doctrine.

The government argues that the propriety of primary jurisdiction in this case begins with an analysis of the AEA and its delegation of authority to the EPA. The Environmental Protection Agency was established under National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.*, and Reorganization Plan No. 3 of 1970, 35 Fed.Reg. 15623 (Oct. 6, 1970). The Reorganization Plan transferred to the EPA, those functions of the Atomic Energy Commission which consist of establishing generally applicable environmental standards for the protection of the general environment from radioactive material. Such standards were defined as including limits on radiation exposure and levels of radioactive material in the general environment outside the boundaries of facilities using radioactive material.

In 1973, the AEC and the EPA executed memoranda of understanding concerning their respective functions under the reorganization plan with regard to AEC-licensed facilities, 38 Fed.Reg. 24936 (September 11, 1973), and AEC-owned, contractor-operated facilities, 38 Fed.Reg. 32965 (November 29, 1973). The latter memorandum acknowledges that both agencies have responsibility for public health, safety and environmental protection. It was agreed that "AEC facilities are subject to generally applicable environmental radiation standards established by the EPA, outside the site boundary, and such facilities will be operated under applicable law so as to comply with such standards... Responsibility for facility operations within site boundaries for AEC facilities and in meeting EPA generally applicable environmental standards at the site boundary are AEC's." *Id.* With respect to licensed facilities, it was agreed that the "AEC will take appropriate action to assure that AEC-licensed facilities are operated in such a manner that routine radioactive discharges therefrom do not exceed generally applicable environmental standards established by EPA, outside the site boundary, for the protection of the general environment from radioactive material." 38 Fed. Reg. at 24936.

Also transferred to the EPA were all functions of the Federal Radiation Council under 42 U.S.C. § 2021(h). Accordingly, the Atomic Energy Act was amended so that the responsibilities of the EPA include those in 42 U.S.C. § 2021(h): "The Administrator shall advise the President with respect to radiation matters, directly or indirectly affecting health, including guidance for all Federal agencies in the formulation of radiation standards and in the establishment and execution of programs of cooperation with States." 42 U.S.C. § 2021(h). Compliance by federal facilities with the

generally applicable radiation standards and the guidance on radiation promulgated by the EPA is required by Executive Order 12088, issued October 13, 1978, which superseded Executive Order 11752, issued December 17, 1973.

Pursuant to this authority, in 1974, the EPA initiated the process of issuing a proposed guidance. In connection with promulgation of the guidance, hearings and public meetings were held in Washington, D. C., December 10 and 11, 1974, and in Denver, Colorado, January 10, 1975. Testimony from numerous sources was received. The record of these proceedings consists of three volumes containing 2,100 pages. *Proceedings of Public Hearings: Plutonium and Other Transuranium Elements,* ORP/CSD–75–1, EPA (1975). The "Proposed Guidance on Dose Limits for Persons Exposed to Transuranium Elements in the General Environment," was published November 30, 1977. 42 Fed.Reg. 60956. Comments were submitted to the EPA and the EPA published its Response to Comments in October, 1978. Technical Report EPA/4–78–010. 44 Fed.Reg. 61104 (October 23, 1979).

At the request of the State of Colorado, the EPA conducted an assessment of the Rocky Flats Plant specifically to address whether there were significant health effects resulting from its operations. Defendants' Pre-Trial Statement, Exhibit E. This assessment concluded that radioactive levels on lands adjacent to Rocky Flats are below those imposed by the Proposed Guidance and therefore do not create a significant health hazard. *See* pp. 536–537, *supra.*

The significance of this factual determination should be considered within the context of the governing statute, the Atomic Energy Act. The comprehensiveness of the AEA merits re-emphasis in the context of primary jurisdiction. Paramount in it is an intention for strong federal control of peaceful and military applications of nuclear energy. The first legislation in the area vested in the federal government a complete monopoly over control and use of materials relating to nuclear energy. Subse-

quent legislation allowed participation by private enterprise to encourage technological advances.

Congress clearly stated the policy of the Act to direct the development, use, and control of atomic energy to make the maximum contribution to the general welfare, subject at all times to the paramount objective to make the maximum contribution to the common defense and security, and to direct the development, use, and control of atomic energy to promote world peace, improve the general welfare, increase the standard of living, and strengthen free competition in enterprise. 42 U.S.C. § 2011. The Act covers every aspect of the development and use of atomic energy for peaceful and for military purposes.

Congress gave the AEC, and its successor, a broad discretion with respect to developing standards for use and possession of materials governed by the Act. It is authorized to establish standards "as the Commission may deem necessary or desirable to promote the common defense and security or to protect health or to minimize danger to life or property." 42 U.S.C. § 2201(b). To the extent this authority involves environmental standards for protection of the general environment, it was transferred to the EPA in 1970. The pervasive regulatory scheme provided in the Act has preempted state authority under its police powers to protect the health and safety of its citizens. *Northern States Power Co. v. Minnesota,* 447 F.2d 1143 (8th Cir. 1971), *aff'd,* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972).

In 1959, the AEA was amended to allow the AEC to discontinue some of its regulatory control over health hazards. By agreement, the AEC, and its successors, may transfer to the individual states regulatory authority over by-product, source, and special nuclear materials in quantities insufficient to form a critical mass, for health and safety of the public. 42 U.S.C. § 2021(b). Such an agreement was entered into with the State of Colorado in 1968. However, the Act further provides that no agreement shall provide for discontinuance of the authority of AEC and its successor organiza-

tions with respect to regulation of "the construction and operation of any production or utilization facility." 42 U.S.C. § 2021(c)(1). Rocky Flats is a production facility. 42 U.S.C. §§ 2014(u) and (v). And no such agreement shall "affect the authority of the Commission under section 2201(b) or (i) of this title to issue rules, regulations, or orders to protect the common defense and security, to protect restricted data or to guard against the loss or diversion of special nuclear material." 42 U.S.C. § 2021(m).

The agreement with Colorado contains correlative provisions excepting from the state's regulatory authority responsibility with respect to "[the] construction and operation of any production or utilization facility," Article II, § A and "under subsection 161(b) or (i) of the Act to issue rules, regulations, or orders to protect the common defense and security, to protect restricted data or to guard against the loss or diversion of special nuclear material." Article IV. Agreement Between the Atomic Energy Commission and the State of Colorado. 33 Fed.Reg. 2400 (Jan. 31, 1968).

█ The other aspect of the primary jurisdiction doctrine which makes it appropriate here involves the expertise and flexibility of the EPA. Defendants allege that examination of the references reviewed by the EPA during the course of proceedings on the Proposed Guidance reveals that the EPA considered most of the existing body of scientific literature pertinent to the subject of health effects of transuranium elements. Similarly, this court has reviewed a significant quantity of scientific evidence relating to transuranium elements and their effects upon health. There is considerable dispute within the scientific community as to the methodology appropriate to measure potential health risks at levels of radiation exposure below that at which contemporary scientific knowledge has demonstrated adverse biological effects. This dispute necessarily involves a value judgment about the use of nuclear science in national defense when the human risks are not knowable.

Ten years ago, Judge Arraj was presented with a similar controversy over scientific methodology in the field of nuclear radiation. He remarked:

Radiation protection standards are established by the various agencies through a complex process. This process entails the review and evaluation of studies of the biological effects of radiation. These studies attempt to ascertain the risk to humans from radiation exposure. The agencies also study the utilization of radioactive processes and materials in order to establish the benefits to be derived from radiation exposure. The setting of exposure standards at a given level requires the weighing of these risks and benefits to be derived therefrom. The weighing requires a value judgment as well as a measuring, and thus the standards are not scientific numbers below which no danger exists. The value judgment embodies complex social and political considerations, for atomic energy has a potential that suggests unlimited benefits to entire nations and presents a risk to entire populations of people, and perhaps their progeny.

... we believe that the decision of the extent and nature of government participation in development of energy sources is a political question for the Congress.... It is for Congress, in making these decisions, to weigh the risks presented by the use of atomic energy in such projects. Our task here is to ensure that the AEC has not exceeded Congressional standards established to protect the public in a utilization of atomic energy which Congress has authorized....

*Crowther v. Seaborg*, 312 F.Supp. 1205, 1231 (D.Colo.1970).

*Crowther v. Seaborg*, (the "Rulison" case), was brought by property owners and public interest groups to enjoin the chairman of the AEC and its contractors from flaring natural gas from a cavity created by nuclear detonation. The Rulison Project, a part of the AEC's program to study peaceful use of nuclear technology, involved detonating a nuclear device in low permeability gas-bearing Mesaverde sandstone. The

flaring was intended to determine whether the nuclear explosion had stimulated production of the gas. The court was called upon to review whether the AEC was acting in excess of statutory authority, specifically, whether the project contained provisions to protect health and minimize danger to life or property, as required by 42 U.S.C. § 2051(d). The court upheld the AEC's actions because the radiation protection standards applied were reasonably adequate to protect life, health and safety, in light of contemporary knowledge at the time the project was conceived.

It is clear from Judge Arraj's discussion of radiation standards that it is not just the complexity of the scientific opinion that is encompassed in "agency expertise." Additionally, establishing standards involves public policy questions which are within the authority of those branches of government responsive to public opinion. The judicial process was not designed or equipped with the tools to formulate such policy and it is inappropriate for courts to intervene in this area of governance.

Plaintiffs contend that the doctrine of primary jurisdiction would only delay resolution of the issues in this case because the EPA has only advisory authority.

Plaintiffs particularly object to deferral to EPA action because that would permit the government to exempt itself from liability in this case by its own fiat. To bolster this position, plaintiffs have sought discovery of the EPA's and DOE's involvement in promulgating the Proposed Guidance. Plaintiffs suggest both that the promulgation was arbitrary and unreasonable agency action based upon the facts, as was the argument in *Rulison*, and that there may have been improper collusion between the EPA and DOE to promulgate a standard which would preclude the DOE's liability in this litigation.

Counsel for Church and Ackard-Butler filed a motion seeking discovery concerning the EPA Proposed Guidance. They requested all correspondence, notes, drafts, evaluations or comments concerning the Proposed Guidance and the Rocky Flats Facility/Technical Assessment Document. A similar request had been included in the November 19, 1976, request for documents. The government had objected to production of the "draft United States Environmental Protection Agency proposal for plutonium in the soil standards" and "all correspondence, evaluations of or comments on this proposal, including but not limited to drafts of comments by all officers of ERDA, NRC, Dow, Rockwell and employees at the Rocky Flats Plant." Two grounds for the objection were stated. The government claimed that the documents were internal governmental memoranda which are covered by executive privilege. In addition, the documents were said to constitute trial preparation material within the terms of Rule 26(b)(3), Fed.R.Civ.P. As pointed out in plaintiffs' December, 1979, motion, the government is asserting both that they are entitled to summary judgment by requesting that the court defer to the guidance, and that its promulgation is trial preparation. This assertion of 26(b)(3) privilege is troublesome in the context of the primary jurisdiction argument since separation of powers is a basis of primary jurisdiction.

At the January 4, 1980, hearing on the discovery controversy, counsel for the government apparently withdrew any objection to providing the requested documents based on Rule 26(b)(3). With respect to the EPA documents, including both EPA drafts and comments submitted to the agency by other agencies, executive privilege would no longer be asserted. By letter to Fairfield & Woods, dated January 31, 1980, the government's counsel confirmed that these documents would be made available. With respect to the DOE, documents which were submitted to the EPA would be released along with the EPA documents. However, as stated in the January 31, 1980, letter to plaintiffs' counsel, the agency would assert executive privilege with respect to internal DOE documents used to formulate the DOE's comments to the EPA.

The January 4, 1980, hearing did not resolve the discovery issues. They were considered premature since the relevancy of

the documents would vary depending upon the applicability of primary jurisdiction. If applicable, the documents would not be relevant to defendants' case, and would only be useful in the plaintiffs' case if it were recast in the framework of a judicial review of the reasonableness of the EPA's action in promulgating the guidance under the Administrative Procedure Act.

After the hearing on primary jurisdiction, counsel for Church and Ackard-Butler made an additional discovery request. The motion for discovery, filed August 1, 1980, is for documents concerning health effects. The government responded indicating they would make some of these documents available informally, but requested the denial of the discovery request because resolution of pending issues may make further discovery unnecessary.

On April 14, 1981, I held a scheduling conference which shifted the direction of this lawsuit into a new phase. At that time, I said that I had been persuaded that the critical question of whether there has been any injury to the plaintiffs could not be litigated because it was an issue which could not be resolved through the adversary process and was, therefore, beyond the court's competence. Plaintiffs' counsel were invited to amend their complaints to add claims to review the formulation of the guidance. The government's counsel were directed to supplement the existing record to show the status of the Proposed Guidance and that yearly authorizations of operations at Rocky Flats were given by the President. On June 2, 1981, two affidavits were filed to this effect. Plaintiffs' June 4, 1981, motion to strike these affidavits was denied by an order entered on September 29, 1981.

An amended complaint in 75–M–1162 and an amended crossclaim in 75–M–1111 were filed June 16, 1981. A tendered amendment to the amended complaint in 75–M–1162 was deemed filed by order of the court on August 17, 1981. The amended complaint, as amended, is offered on behalf of Church and Ackard-Butler. Although this issue has not been raised, by adding claims not within their original complaint in intervention, the intervenors have violated the conditions imposed by the court upon granting intervention.

The amended crossclaim makes insignificant additions to the original crossclaim and incorporates the amended complaint. The amended complaint, as amended, in 75–M–1162, added two unknown federal agents, the State of Colorado, and Jefferson County as defendants. To the jurisdiction citations of the earlier complaints, jurisdiction under the Administrative Procedure Act, 5 U.S.C. § 702, was added. However, no corresponding claim for relief under the APA was stated. For the civil rights claims against the state and the county, 28 U.S.C. § 1343 was included as a jurisdictional basis. Several of the new claims are dependent upon the court's assumption of pendent jurisdiction.

Updated descriptions of Church and intervenor's properties are set forth which include the transfers to Good Fund and the retransfers. A reference is made to another conveyance of a portion of Church's land to the Tosco Corporation, December 18, 1979. Church's claims for contamination of this portion of land were not assigned to the purchaser.

The general allegations are broadened to correspond with the factual and legal development of the case. Allegations are made with respect to state and county restrictions on development, warnings in certain U. S. government loan programs, the ultrahazardous nature of the materials at Rocky Flats, the duties of the respective defendants, and specific acts and omissions causing contamination. A subsection of the amended complaint is devoted to allegations of the level of contamination. Although it is alleged that contamination levels are higher than at other locations, and that the Colorado plutonium standard has been exceeded, no allegation is made that the Proposed Guidance dosage limitation has been exceeded.

Another section states allegations concerning the Proposed Guidance and Technical Assessment documents. Plaintiffs al-

lege that the Proposed Guidance is not final agency action. It is asserted that neither the Proposed Guidance, if it is considered to be final agency action, nor the Technical Assessment, are legally binding on anyone, including federal agencies. Plaintiffs do not concede that the Proposed Guidance levels of 3 millirad to the lung or 1 to the bone have not been exceeded. Nor do plaintiffs concede that the soil screening levels are part of the Proposed Guidance. Deficiencies and scientific inaccuracies in the Proposed Guidance & Technical Assessment are detailed. In addition, it is alleged the defendant United States promulgated these documents to defend this specific litigation. An additional subsection delineates claims of adverse health effects from radioactive contamination and the injury which reasonable fear has caused to plaintiffs' land. Exhibits attached to the amended complaint are three drafts of the text of the Proposed Guidance, an epidemiologic evaluation of cancer incidence related to Rocky Flats radiation, copyrighted by Fairfield and Woods, and maps of contamination in the Denver area.

Thirteen claims for relief are stated against the federal defendants and eight against the state and county. With respect to the federal defendants, negligence, trespass and nuisance are claimed against all three defendants. Plaintiffs include an additional claim for relief against the United States under the FTCA. Dow and Rockwell are also claimed to be strictly liable. Exemplary damages are requested from all three defendants. A declaratory judgment that defendants have taken plaintiffs' property is requested. Claims of the constitutional torts of deprivation of property without due process and taking without just compensation are stated against the two unknown federal agents. An inverse condemnation claim is stated against the United States based on the fifth amendment and another based upon provisions of the Atomic Energy Act. In addition, a constitutionally implied contract based upon the just compensation clause is stated against the United States. A taking is claimed against all three defendants under the Colo-

rado Constitution. Plaintiffs pray for attorneys' fees, $26,310,000.00 actual, and $160,000,000.00 exemplary damages against the federal defendants. A jury trial is demanded.

With respect to the state and the county, claims of a taking of all economically viable uses of plaintiffs' property in violation of the United States Constitution are stated against both defendants. These claims are based on a number of regulatory actions on behalf of both entities which restrict development of plaintiffs' land including state Department of Health policies, designated "Suggested Interim Guidance" and "Area of Concern", the state plutonium standard, and zoning restrictions in the Jefferson County Land Use Policy Plan.

A claim of deprivation of civil rights is stated against Colorado and another against Jefferson County under 42 U.S.C. § 1983. The deprived right is said to be the interest in all practical, beneficial or economic use of the property. Inverse condemnation claims based on the Colorado Constitution and eminent domain statutes are stated against both of these defendants. A declaratory judgment is requested that, if the court concludes that the EPA Proposed Guidance conclusively determines the absence of health risks, state and county restriction on development are without effect because the state and county lack the power and authority to impose them.

Jefferson County filed a motion to dismiss the claims against it on September 23, 1981. The State of Colorado filed a motion to dismiss the claims against it on October 13, 1981. The federal defendants filed a motion to strike the amended complaint and amended cross-claim on July 6, 1981. The court treated this as a motion to dismiss and denied it by order dated September 29, 1981. On October 26, 1981, the government filed its answer to the amended complaint in 75–M–1162, as amended, and amended cross-claim in 75–M–1111. On November 13, 1981, the government filed a motion renewing all prior motions, briefs and statements of position directed toward the amended complaint and crossclaim.

The amended complaint, as amended, in 75–M–1162, adds a number of contentions not asserted by the other plaintiffs in these consolidated actions. At the September 25, 1981, scheduling conference, counsel for Good Fund and Great Western stated their positions on the record. Neither party intended to amend their complaint in accordance with the amendments in 75–M–1162, or to add anything to the record.

On September 16, 1981, counsel for Church and Ackard-Butler filed a motion for summary judgment concerning the EPA Proposed Guidance. Three grounds are stated. The first is that the EPA Guidance is inapplicable because by the 1968 agreement between the United States and Colorado, the United States transferred to the state exclusive authority to regulate the general environment for the public health and safety with respect to uranium and plutonium. Secondly, the EPA Proposed Guidance does not preempt the state standard on plutonium. Finally, the Proposed Guidance is asserted to be void because it was developed by an unlawful cost-benefit analysis and because it protects those who may be contaminated in the future more than those presently in contaminated areas, it violates the Equal Protection Clause of the fifth amendment and the Atomic Energy Act.

The 1959 Amendments to the AEA authorize discontinuance by the AEC, and its successors, of regulatory authority over by-product, source, and special nuclear materials in quantities insufficient to form a critical mass. 42 U.S.C. § 2021(b). *See* pp. 538–539, *supra.* Because the quantities of these materials on plaintiffs' lands are less than sufficient to form a critical mass, plaintiffs argue that the agreement with Colorado discontinues regulation of plaintiffs' property by the federal agencies under the AEA.

The Rocky Flats Plant itself is outside the state's jurisdiction. The agreement with Colorado clearly does not discontinue the AEC's, and successor agencies', authority to regulate Rocky Flats. The plant handles quantities of by-product, source, and special nuclear materials in quantities sufficient to form a critical mass. Furthermore, the AEA explicitly excludes from discontinuation by state agreement of the AEC's regulation with respect to "the construction and operation of any production or utilization facility." 42 U.S.C. § 2021(c). Rocky Flats is such a production facility. *Id.* §§ 2014(u) and (v).

■ The AEA and case law indicate that agreements with the states do not transfer to the states the authority to regulate environmental discharges from nuclear facilities. *Northern States Power Company v. Minnesota*, 447 F.2d 1143 (8th Cir. 1971), *aff'd.* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972). Such regulation is delegated exclusively by the AEA to the AEC. *Train v. Colorado Public Interest Research Group, Inc.*, 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976). *Train* concerned two nuclear facilities in Colorado. The agreement with Colorado was not discussed in the case although it was in effect at that time.

In *Train*, the Court held that the Rocky Flats Plant and Fort Saint Vrain Nuclear Power Plant were not required to comply with the effluent permitting requirements of the Federal Water Pollution Control Act. Under that act, the EPA, or the state, if it has implemented a water pollution control program, pursuant to the FWPCA, is authorized to regulate discharges of pollutants including "radioactive materials." In *Train*, the court referred to the legislative history of the FWPCA to define "radioactive materials" as those materials "not encompassed in the definition of source, byproduct or special nuclear materials as defined by the Atomic Energy Act of 1954, as amended, and regulated pursuant to that Act. 'Radioactive materials' encompassed by [the FWPCA] are those beyond the jurisdiction of the Atomic Energy Commission." 426 U.S. at 11 (quoting H.R.Rep.No.92–911, p. 131 (1972)).

Effluent standards are established in 10 C.F.R. Part 20 for nuclear facilities licensed by the NRC. Rocky Flats is not a licensed nuclear facility. In *Train*, based on Execu-

tive Order 11752, which was superseded in 1978 by Executive Order 12088, the Court found that Rocky Flats was required to comply with 10 C.F.R. Part 20. 426 U.S. at 6–7, n. 5, 96 S.Ct. at 1940–1941, n. 5.

The Eighth Circuit, in *Northern States Power Company v. Minnesota*, 447 F.2d 1143 (8th Cir. 1971), *aff'd.* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972), held that the Atomic Energy Act preempted the regulation of radioactive waste releases from nuclear power plants to the exclusion of the states. The Minnesota Pollution Control Agency granted the Monticello nuclear-fueled electric generating plant, a "utilization facility" under the AEA, a disposal permit subject to conditions relating to the level of radioactive liquid and gaseous discharges and requiring monitoring for detection of such discharges. These conditions were more stringent than those imposed by the AEC under federal law.

The Eighth Circuit found that the only authority the states had to regulate radiation hazards was that which could be transferred to them by agreement under the 1959 Amendments, 42 U.S.C. § 2021. Minnesota had not entered into such an agreement. However, Minnesota had conceded that regulation of radioactive discharges from nuclear power plants did not fall within the categories of regulation which could be transferred to the states. The court stressed this by reference to the prohibition in 42 U.S.C. § 2021(c) of discontinuation of AEC regulation of production and utilization facilities. The Eighth Circuit stated that the legislative history made it clear to that court that regulation of production and utilization facilities included "control over radioactive effluents discharged from the plant incident to its operation." 447 F.2d at 1149, n. 6.

Plaintiffs argue that *Northern States* has been "overruled" by Congress in the context of radioactive air pollution since those pollutants may be included within the regulation of the Clean Air Act. The 1977 amendments to the Clean Air Act authorize the EPA to review radioactive pollutants, including source material, special nuclear material, and by-product material, to determine whether they may reasonably be anticipated to endanger public health. 42 U.S.C. § 7422. The EPA is required to enter into an agreement with the N.R.C. with respect to regulating such emissions to minimize duplication of regulation. *Id.* § 7422(c).

In 1979, the EPA concluded that radioactive pollutants did endanger public health and amended the list of hazardous air pollutants to include radionuclides. 44 Fed.Reg. 76738 (December 27, 1979). The EPA and the NRC then entered into an agreement of cooperation with respect to NRC-licensed facilities. Under it, the EPA has the authority under the Clean Air Act to promulgate standards for airborne radionuclide emissions, and the NRC has the primary role in implementing and enforcing them. Thus, the actual regulation of the facility has not been altered by the Clean Air Act amendments.

The area of regulation of nuclear facilities not pre-empted by the AEA is "for purposes other than protection against radiation hazards." 42 U.S.C. § 2021(k). *Pacific Legal Foundation v. State Energy Resources Conservation and Development Commission*, 659 F.2d 903 (9th Cir. 1981). That case determined that an amendment to the California "Nuclear Laws" which imposed a moratorium on certification of nuclear power plants until the state Energy Commission made findings that a federally approved method of nuclear waste disposal existed was regulation for purposes other than protection against radiation hazards. The moratorium had been motivated by an interest in guaranteeing sources for the state's electricity needs. The lack of waste disposal methods "clogged" the system and resulted in uncertain electricity production from nuclear plants. The Ninth Circuit suggested that other regulation not preempted by the AEA, may include zoning requirements for purposes other than control of radiation hazards.

Relying upon the AEA and these cases, it is clear that neither the EPA's authority to promulgate generally applica-

ble environmental standards nor the Proposed Guidance could be transferred to Colorado by the Agreement. The EPA's authority is part of the authority to regulate environmental discharge from a nuclear facility exclusively regulated under the AEA.

■ Even if regulation of offsite radiation effects could be transferred to the states, clearly the EPA's authority to promulgate the Proposed Guidance could not be delegated. This authority is included within § 2021 of the AEA, entitled "Cooperation with States." Subsection b authorizes the agreements with the states. Subsection c prohibits discontinuation of certain authority. Subsection h directs the EPA to "advise" the President and provide "guidance" to federal agencies in establishing and implementing programs of cooperation with the states. It would be nonsensical to conclude that subsection h authority may be transferred to the states.

Plaintiffs' second ground for summary judgment on the EPA Proposed Guidance is that it does not preempt the Colorado plutonium standard. The government asserts that neither the status nor the intent of the Proposed Guidance is material to the question of preemption. It is the AEA that has preempted regulation of radiological hazards. The only authority Colorado has is that which can be transferred by agreement. If the Colorado plutonium standard is necessarily an attempt to regulate Rocky Flats as the source of that plutonium, it is beyond the state's authority since it amounts to regulation of a production facility. I find this argument persuasive.

■ Colorado has filed a brief stating its position on preemption. The state contends that a conflict between the Colorado plutonium standard and the Proposed Guidance does not necessarily exist. Without a conflict, preemption is not an issue. The state standard is explicitly directed at special construction techniques. Its effect is to protect construction workers and deter further dispersal of the plutonium during construction. It does not address how the plutonium reached the construction site. Colorado further contends that the preemption issue is premature since the Proposed Guidance is not final. I accept Colorado's interpretation of its standard.

The third question presented in plaintiffs' motion for summary judgment on the Proposed Guidance challenges the manner in which it was promulgated. Whether it was devised by an illegal cost-benefit analysis and whether it violates equal protection may be considered within the context of an APA action to determine whether the EPA acted arbitrarily, capriciously or in excess of its authority in promulgating the Proposed Guidance. This action is not yet before the court and the court lacks jurisdiction to consider it until the agency action is finalized.

## IV. SUMMARY OF CONCLUSIONS

It is apparent from the extensive record developed in this litigation that the plaintiffs are unable to prove that the deposition levels of transuranium elements on the subject real property exceed the safety limits of the Proposed Guidance promulgated by the EPA. The plaintiffs contend that the Proposed Guidance is not an adequate standard for protection of the public from health hazards associated with radioactivity. All of the plaintiffs' assertions of theories of liability converge into the contention that this court, acting through a jury or otherwise, should construct a standard of care different from the Proposed Guidance and compensate the plaintiffs for the proximate results which may flow from a failure to achieve that standard.

At earlier stages in this litigation, I was scornful and sharply critical of the government defendants' position that the national government could engage in an activity which citizens claim is harmful to them and then insulate itself from liability by using one of the government's agencies to find and conclude that there is no harm. The long struggle in this litigation has changed my thinking and I am now persuaded that the government defendants' position is correct, at least in the absence of a showing of personal injury to any specific person.

The difference in my thinking is the result of my reflections on what I perceive to be the role of the federal judiciary in the system of government established by the United States Constitution. More specifically, my conclusion comes from a concern about limitations inherent in the adversary litigation process and a recognition of restrictions on the authority of the judiciary to control the destiny of a nation organized under a republican form of government.

Providing for the common defense was among the specific purposes for the formation of the union, as recited in the Preamble to the Constitution. To pursue that goal, the delegations of power to the Congress include the power to provide for the common defense, to declare war, to raise and support armies, to provide and maintain a navy, to make rules for the government and regulations of the land and naval forces, and to make all laws necessary and proper for executing those powers. U. S. Constitution, Art. I, § 8. The President is the Commander-in-Chief and is charged with the execution of the laws. U. S. Constitution, Art. II. The Congress and the President are, of course, accountable to the people who select them in regularly conducted elections.

Article III of the Constitution vests the judicial power in the Supreme Court and such inferior courts as the Congress may ordain and establish. The judges of those courts hold office during good behavior and the decisions of the court are not subject to any referendum. Accordingly, the manner in which the Constitution and laws of the United States are interpreted for the purpose of resolving the cases and controversies before the courts rests on principles which do not change according to public opinion.

While these are elementary matters known to beginning civics students, a restatement of them is helpful in recognition of the limitations upon the authority and competence of the court. The impulse to do justice by the redress of all grievances must be restrained by a respect for the authority of the political branches of government which reflect the collective will of the people in the exercise of their sovereign power.

Self limitation by the judiciary has come in the form of the "political question doctrine" as stated in *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962):

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

The primary jurisdiction doctrine is another form of judicial restraint. It is more complicated than the political question doctrine because it involves congressional delegation of discretion to an agency. It will arise when Congress has passed a statute regulating an area under the supervision of an expert administrative agency whose supervision involves factual determinations aided by the special expertise of the agency. Once the agency has acted, the court must determine the extent to which it will defer to that special expertise or review the agency's action.

Another area of judicial self-restraint arises in connection with matters involving the armed forces. The Feres doctrine, attributed to *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), holds that a serviceman injured as a result of activity incident to his service may not sue the United States for compensation under the Federal Tort Claims Act. In part, it is based upon the Court's perception that such suits would have a deleterious effect upon

military discipline. "The peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty, led the Court to read that Act as excluding claims of that character." *United States v. Brown*, 348 U.S. 110, 112, 75 S.Ct. 141, 145, 99 L.Ed. 139 (1954). Ameliorating the harshness of the *Feres* doctrine is the provision of compensation under the Veterans' Benefits Act.

The distinctive aspects of military decisions have led the Supreme Court to exercise "a healthy deference to legislative and executive judgments in the area of military affairs." *Rostker v. Goldberg*, 453 U.S. 57, 66, 101 S.Ct. 2646, 2652, 69 L.Ed.2d 478 (1981). In the draft registration case, the Supreme Court found the District Court in error for undertaking an independent evaluation of the evidence of whether men and women are similarly situated for combat rather than "adopting an appropriately deferential examination of Congress' evaluation of that evidence." *Id.* at 83, 101 S.Ct. at 2661.

In *Weinberger v. Catholic Action of Hawaii/Peace Education Project*, —— U.S. ——, 102 S.Ct. 197, 70 L.Ed.2d 298 (1981), the Court refused to review whether the Navy was required to prepare a site specific environmental impact statement with respect to the operation of a facility capable of storing nuclear weapons. The Navy had prepared a technical assessment and a generic environmental impact statement, but not one addressing site specific data. National security reasons precluded disclosure of whether nuclear weapons would be stored at the facility, yet it was the proposal for actual storage which would trigger the EIS requirement. The court held that whether the Navy had complied with NEPA to the fullest extent possible was beyond judicial scrutiny because public policy forbids maintenance of any suit the trial of which would inevitably lead to disclosure of matters which the law itself regards confidential, and respecting which it will not allow the confidence to be violated.

The operation of these various principles render some disputes without judicial recourse. Recognition of the limitations of its own power is a primary responsibility of the judiciary.

"The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy."

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 629, 72 S.Ct. 863, 886, 96 L.Ed. 1153 (1952) (J. Douglas concurring) (quoting *Myers v. United States*, 272 U.S. 52, 293, 47 S.Ct. 21, 84, 71 L.Ed. 160 (1926) (J. Brandeis dissenting)).

Only by adhering to these concerns, may the Rocky Flats nuclear weapons production enterprise be evaluated. Rocky Flats is a creature of the Atomic Energy Act. The AEA, its forebearers and amendments, were enacted under the authority granted to Congress in Article I of the United States Constitution to provide for the common defense and security, to promote the general welfare, protect the health and safety of the public, and regulate interstate and foreign commerce. 42 U.S.C. § 2012.

The Atomic Energy Act comprehensively provides for every aspect of the development and use of atomic energy for all purposes. It is the exclusive legislation in the area. It delegates broad discretion to the agency administering it. It authorizes the AEC, and its successors, to engage in the production of nuclear weapons and requires them to minimize health hazards. The agency's authority to engage in weapons production is limited to the extent it is authorized yearly by the President.

■ The primary dispute in this litigation arises because the Congress and a succession of Presidents have determined that nuclear weapons are necessary for the national defense and they have selected the Rocky Flats Plant as a place to produce

components of such weapons. Those decisions are not reviewable in this court at this time. The plaintiffs' contentions are that the manner in which these authorized operations have been conducted has caused the deposition of transuranium elements on their lands which then have become unusable because of claimed resultant health hazards. It is my considered view that the determination of the existence of such hazards and the acceptability of them are also political decisions for the Congress and the President. They have placed responsibility for the collection and evaluation of the relevant data in the designated agencies and in the absence of a showing that there has been a violation of the agency standards, this court has no power to intervene. Accordingly, all of the plaintiffs' claims against the United States, Dow, and Rockwell must be dismissed for lack of jurisdiction. There are, of course, other claims and parties in the three cases. Because those elements will be affected materially by this ruling, it should be made subject to immediate appeal by the entry of a final judgment as authorized under Rule 54(b) of the Federal Rules of Civil Procedure. Whether such other claims should be pursued pending appeal is a matter which should be addressed at a status conference.

Upon the foregoing, it is

ORDERED that all of the plaintiffs' claims in these cases against the United States, Dow Chemical Co. and Rockwell International Corporation are dismissed, and it is

FURTHER ORDERED that the Clerk shall forthwith enter a final judgment of dismissal because there is no just reason for delay, and it is

FURTHER ORDERED that counsel for all parties shall appear at a status conference to be convened in courtroom C–202, United States Courthouse, 1929 Stout Street, Denver, Colorado, on Wednesday, July 28, 1982, at 8:30 A.M.